Good morning, and may it please the court. My name is Tim Everett. I'd like to reserve two minutes for rebuttal. I'm here today to represent the petitioner, Mr. Manu Mayala. Mr. Mayala petitions for a review of a decision by the immigration judge, which was summarily affirmed by the Board of Immigration Appeals. Mr. Mayala asserts that the negative credibility decision of the immigration judge does not withstand scrutiny and is not supported by substantial evidence. Primarily, the immigration judge based his negative credibility decision on three areas of inconsistencies. I'll try, sir. I apologize. I don't think there's anything wrong with my hearing. Maybe there is. Are the mics turned on? I'll do my best. I have a cold, and I might have a little bit of a sore throat, but I'll do my best. And I apologize. Like I said, the immigration judge, in my reading of the record, based his negative credibility decision on three areas of inconsistencies. Two of these areas involve a 1996 detention of Mr. Mayala and his father. That is not the primary basis. That's not the primary basis of his claim. In fact, after 1996, the government changed in the Democratic Republic of Congo, and so his claim is not based on that 1996. It's background information. The other inconsistency... Does that eliminate from consideration any inconsistency with respect to that incident? No, Your Honor. Obviously, that's there, but I guess my assertion would be that it doesn't go to the heart of his claim. And it wasn't... And I think even if we looked at that, even when we look at that in detail, there may be some inconsistency, but that was a long time ago, even at the time of his testimony. And he was a young man at that point in time, so there were many things going on. I don't think it would be too difficult for him to get something wrong when he was giving testimony. These... Primarily, the inconsistencies deal with what was stated in a sworn statement, an unsworn statement, and what he testified to. And as all attorneys know, testimony can be very nerve-wracking. He testified for several hours in court. We have 100 hours of transcript, plus we have many other sources of evidence that seem to all be consistent. And the gist of his argument is that these three areas are not substantial evidence in light of the record as a whole. And the record as a whole, I think, I find very convincing, the statement from the psychologist, which the judge did not consider in its entirety or give much weight, because he found her statement that she had never found anyone malingering to be incredible. He found... He didn't state it that way in his decision. He said she did not find anyone to be not credible. So... What does the psychologist's testimony have to do with the truth of what happened? She doesn't purport to express any view of that, couldn't. Well, she testified that she found them to be... to not be malingering. She spent seven hours with them. Well, that's not... I mean, first of all, it's probably not relevant what she thinks. I mean, that's a decision for the I.J. to make. I understand that. But I understand... But my point is, her statement, her sworn statement is evidence in the record. Sure. And we have a judge who considers three areas of inconsistencies, two which are not... I already did not get to the heart of the claim. And does not mention demeanor, as far as I could see, in his decision. Whereas the psychologist spends a long time talking about demeanor. I mean, the I.J. did not discredit his testimony on the footing of demeanor. So the fact that she went on for a long time substantiating that his demeanor was fine just doesn't have anything to do with the decision. I'm not trying to say that her... She's a decision maker. Obviously not. I'm trying to contrast the fact that an immigration judge, after hours of testimony, does not even mention demeanor in his decision. I just can't find that... I don't see why that would not be important in a credibility decision. I argue that it is important. Well, sometimes it's extremely important because somebody's twitching and looks nervous and whatever. But that doesn't necessarily... The fact that somebody has a calm, cool, persuasive manner doesn't necessarily mean that the incidence in his version of what happened stands up, does it? No. And obviously, that's a consideration. Okay. I'm sure it is. But our question now is whether the I.J. was compelled on the footing that you're asserting to reach a contrary decision. I don't think... I don't... I think that there's not substantial evidence. The only... The detention... The detention after the arrest of 2000 where Mr. Mayala says that his family was taken to two other prisons that he does not... He mentions a different one in his testimony. He mentions the prison Makala. And in the sworn statement, he mentions two other facilities. But if you look at this, I don't think it stands up. Look at page 168. This is relating to the detention after the 2000 arrest. 168. He does not say when he's questioned, what did the officer tell you? That officer told me that my parents were as well in prison like I was. It's only a couple lines before that that he mentions the Makala prison. It does not link directly his parents being in that prison in his testimony. Now, obviously, you can make that connection, but since this is so important and that's the only area that I think goes to the heart of his claim, I don't think that's the substantial evidence to support the credibility. And that's not even considering the other, and I think, credible evidence in the record. He testifies about being detained. He testifies about being held in prison, mistreated in prison. He testifies about people coming into his house. We don't see any mention of inconsistencies in those areas. Can I ask you another question? Yes, Your Honor. Obviously, there was a regime change after the 1996 incident. Has there been a regime change that matters since the 2000? There was, but whether it matters is I think the record shows that it does not substantially because the basis of his claim is his ethnicity as a Tutsi. And what happened was some of the Tutsis went from Rwanda into the eastern part of the ERC. And what happened is once Kabila became the ruler, he was at one time allied by those, but then when he started messing up, the Tutsis, the Rwandans, the Nugandas became his enemies. And so he started to seek out the Tutsis. Now, he was assassinated shortly after in January of 2001. His son came into power, and a 2003 U.S. State Department report shows that there continues to be violence and discrimination against the Tutsis. So I think although there has been changes, I don't think there's been a change in that aspect. Now, obviously, if we prevail on this, we would like to see it remanded so we can look at current country conditions. Just to clarify, your claim of protected ground is not on account of ethnicity? It is, Your Honor. It's not on account of political opinion anymore? Well, that's, I mean, what we have is ethnicity and an imputed political opinion because what happened with the Kabilas, they found, they thought all Tutsis were supporting this sort of counter-movement against their power. So it's imputed political opinion, social group, and ethnicity, Your Honor. For purposes of the 2000 instance? The 2000 instance is the only one that is relevant. I mean, directly relevant. On both bases? Yes, Your Honor. Okay, thank you. All right. All right. Good morning. May it please the Court. My name is Jocelyn Wright. I'm here on behalf of Respondent, United States Attorney General. Let me first address counsel's point regarding page 168 of the record on the testimony regarding whether or not Petitioner's parents were with him at Makala Prison as well. Page 168 of the record says that the question was, now while you were at the Makala Prison, where were you held? And his answer was, I was separated from my parents. We were all there, but I was in a different cell. There was no other way to glean from that, but that the parents were there in Makala Prison with him. So there's no ambiguity, and the record doesn't compel the conclusion that Petitioner is now advancing before this Court regarding interpreting that testimony in the record. But the immigration judge … But the parents were in prison, weren't they? Yes. And he said, well, we were all there? Yes, that's what he said. That's the big discrepancy. Well, that's one of the inconsistencies that the immigration judge relied upon to question his credibility. I don't see where that's such a big deal. They were both in prison, they were in different prisons, and he's up there and he testifies and says, we were all there. He could be thinking, well, they were in one place, I was here. We were all there. In the context of the testimony, when he says, when the question was why you were at Makala, and he says, we were all there, but I was in a different cell, the immigration judge reasonably inferred from that, that they were all being held at Makala, even though he was being held in a separate cell than his parents were. But they were in another prison. No, no, he testified that they were all held at Makala. Where were his parents? Well, that's the point. He testified that they were all held at Makala, but his declarations, his two written declarations, say that his parents were not held there, that they were transferred to another prison outside of Makala. And the immigration judge found it. When he was before the immigration judge, was he represented by counsel? Yes, he was, Your Honor. And who prepared the application? Well, he submitted the written application to form I-589. Apparently, it was prepared with the help of an individual named Nicholas, as well as another unnamed individual. However, he did submit a supplemental declaration prepared by his present counsel, who represented him below as well, to supplement the I-589. The immigration judge did give him that opportunity. The problem arose because his declaration that was prepared and submitted to the INS affirmatively, that was accompanied with the form I-589, was inconsistent in material ways with the supplemental declaration that he submitted when his case was before the immigration judge. You know, we see a lot of cases where there are these inconsistencies. Some people go to notorials, and they just sit there with somebody they don't know, just takes a few notes, and they fill out an application, and the people don't even read English or have a big problem with it, and they sign it, and they're off. They're told everything is fine. And then they testify, and something else comes up. Well, that's true, Your Honor. But in this instance, his counsel and petitioner were both aware of the inconsistencies between the written application that was initially submitted to the INS and the supplemental declaration, as well as his testimony before the immigration judge. And being aware of the inconsistencies, and his attorney flagged it for the immigration judge. He said, you know, the first declaration was never read back to my client, so he's not going to be able to testify necessarily consistently with it. So there was an awareness in the record that these were inconsistent. He had the opportunity to clarify those inconsistencies during the hearing. He had the opportunity to bring in Nicholas, and the record shows that the I-589 actually includes not just Nicholas' name, but the address where he could be found. And apparently that was provided by a petitioner to the asylum officer when he had his affirmative asylum interview that resulted in the referral of the I-589 to the immigration judge. So he had the opportunity to bring Nicholas in and have Nicholas explain that, yeah, I really didn't have him, I didn't read the asylum application back to him, so it may not be consistent, so my understanding may not have been perfect. The burden was on him to do that. He was aware of the issue, he was aware of the need to clarify it, but he didn't. There was ample opportunity, as counsel said. He was given at least four hours, pardon me, to present testimony. And he had another hearing after that where the expert testimony was brought in. And so he had several opportunities to bring in the witnesses that he needed to bring in in order to clarify any inconsistencies that troubled the immigration judge in this case. The fact that he didn't take advantage of those opportunities is not a basis for concluding that the immigration judge didn't do his job or that there was a denial-of-due process. What we have here is... Well, did the immigration judge make any attempt to clarify those inconsistencies by asking the applicant questions? Well, the immigrant, I'm sorry, the petitioner's attorney and the INS, the DHS attorney here, both questioned the petitioner extensively. And they had closing arguments, and the immigration judge took all of that into advisement and gave additional opportunities for submission of additional documents. And after that, the immigration judge issued his written decision. And so there was an opportunity for all of the parties to... The big problem was that he indicated, or his words were interpreted to mean that they were all in one particular prison, whereas his parents were in another prison. Well, that wasn't the only inconsistency, Your Honor. He also testified inconsistently regarding the 1996 arrest. And I understand the petitioner's argument now that that's not relevant to his present claim. But I disagree. I think it is relevant because he did rely on it to establish the pattern and practice that he was a member of the Tutsis and that the Tutsis were being persecuted by the government, by the Congolese government. And so to the extent that the events that happened in 1996, the arrest... Well, it's true that the Tutsis have been decimated. Yes. I mean, they've just been brutalized, right? Yes. Lots, who knows how many tens of thousands have been killed. That's correct, Your Honor. And the immigration judge did find a pattern and practice. And it's not hard to believe that someone else who's not a Tutsi in these crazy situations that go on there might figure they're all the same, huh? All Tutsis are the same. I'm not sure I understand. That's okay. Well, with respect to the Tutsis, the immigration judge did find that there was a pattern and practice of persecution of that group in the DRC. However, the immigration judge also determined that the petitioner... What's the inconsistency? Well, it's not an inconsistency there, but the immigration judge found that the petitioner failed to establish that he is, in fact, a member of that group because there's no evidence. Given his lack of credibility, there's absolutely no evidence in the record to establish that he is indeed a Tutsi, a bi-member language. He said he was a Tutsi, didn't he? I'm sorry? He said he was a Tutsi. He said he was, but the immigration judge found him not credible, Your Honor, and that's the problem with respect to that aspect of the claim. And he did have the opportunity to submit evidence into the record. The record shows that he was able to submit not just his birth certificate with his parents' names, but also documents from the Congolese government, not government, but the Congolese Palu Party membership. This was apparently obtained after he came here. So there was an opportunity and the ability to get these documents, and the burden was on him to establish that his mom and his dad were indeed Tutsis and that he is indeed ethnically a part of this persecuted group. The immigration judge... He said, I'm a Tutsi. All right. Yes. You can tell me who you are, and I say, I don't believe you. I don't believe you. Well, the immigration judge didn't find that sufficient, given the other problems with his credibility in the record, Your Honor. And so because there's no evidence, independent evidence, other than his self-serving testimony to corroborate his claim that he is a Tutsi ethnically, there's no basis in the record that would compel reversal of the immigration judge's conclusion with respect to that aspect of the claim. If he'd had a better lawyer, he'd be in better shape, is that it? I'm not sure it can be attributed to his attorney, Your Honor. I think his attorney did a fine job in this case. He just had to get all this information. He had time to prepare. He had time to explain the inconsistencies, but he didn't. Well, I understand that attorneys have to have their clients' cooperation. I don't know to what extent the client's cooperation in this case. There's no evidence that he didn't cooperate with his lawyer, is there? I don't know, Your Honor. Yeah, okay. With respect to the expert testimony, as Judge Reimer pointed out, the expert's testimony wasn't a basis for the adverse credibility determination. And even assuming that the expert was correct, that he is suffering from PTSD, there's no indication that that PTSD arose specifically from his alleged events of persecution or torture rather than the general upheaval that goes on in Congo and the wartime conditions there. I see that my time is up. Probably, would you say it's more likely that it arose from his torture? I mean, they wanted him to have him eat feces and drink urine and all that. Well, it's true, Your Honor. If those events are true, then I would not contest that that would be torture. But the problem is that in this case, the immigration judge found that that was not necessarily a credible claim given the other inconsistencies and lack of objective corroborating evidence in the record. So you get an inconsistency between where he was in prison and his parents were in prison and then everything else that he testified to is suspect. Well, it goes to the heart of his claim because if he is unable to tell a consistent, cogent, and detailed story about what happened to him, it does tend to undermine or at least call into question the truthfulness of what he's saying. I mean, it's easy enough to memorize. It has to be something that goes to the heart of his claim. It does go to the heart of his claim because of that. Yeah, that's right. Unless there are any further questions from the Court. Yes, the petition for review be denied. Thank you. Your Honors, I would just like to make a... You had time to prepare it. Pardon me, Your Honor? Huh? Pardon me? You had time to prepare it. Your Honor, we prepared it as best we could. What does that mean? I worked with Mr. Mayala. We've appeared in court many times. I worked with the psychologist. We did research. If there's inconsistencies that are due to my representation, I would take responsibility. However, I assert that given all this testimony and these inconsistencies to the extent I don't... In looking at this transcript again, he's asked about where his parents are held. His only direct knowledge is from what the guard told him. What the guard told him does not mention the prison. It just mentions that they're in prison. Now, when we did his declaration, he inferred that they were in this other place. And when he testified, maybe he inferred... He doesn't state directly that they were in my college. So, you know, a hearing is not a play. Respondents, they testify the best they can. It doesn't always come out entirely... They don't memorize it if it's real. It just comes out spontaneously. And I think that given the volume of the record here, I just don't find these inconsistencies, if they exist, substantial evidence. Now, and just before I run out of time, there are two letters stating that he's a Tootsie. And these are pages 492 and 495. That's independent evidence. It's from community members who should know. One's from the Palu Party, which is an opposition party. And then there's a sworn statement from a Dr. Oregio attesting to injuries, scars from injuries. That's at page 615. This is independent. He has scars, and those scars are consistent with his statements about how he was mistreated. Now, this has nothing to... This is completely independent, so I just... It's not true that there's not independent evidence in there, besides his self-serving, to put it in quotes, self-serving testimony in this matter. So I would ask the Court to consider this and remand so we can look at current conditions. All right. Any further questions? No, Your Honor. All right. Thank you. Okay. Thank you very much. The matter is submitted. Now we come to United States v. City of Santa Monica.
judges: Pregerson, Rymer, Korman